J-A03020-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN RE: T.L.C., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: T.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1356 MDA 2019 |

Appeal from the Order Entered July 18, 2019
In the Court of Common Pleas of Columbia County Juvenile Division at
No(s):  2018-OC-0000213-RT

BEFORE:  LAZARUS, J., STABILE, J., and DUBOW, J.

MEMORANDUM BY DUBOW, J.:                    **FILED APRIL 08, 2020**

Appellant, T.C. ("Father"), appeals from the July 18, 2019 Order entered in the Columbia County Court of Common Pleas that involuntarily terminated his parental rights to T.L.C. ("Child").  Upon careful review, we affirm.

The lower court has provided this Court with a well-written, thorough, and comprehensive Opinion, which sets forth the relevant factual and procedural history of this case, and we adopt its detailed recitation for purposes of this appeal.  *See* Trial Ct. Op., filed 7/18/19, at 1-9.  In sum, Father and C.L.C. ("Mother") are the biological parents to Child, who was born in June 2015.  Mother, who is an indicated perpetrator of abuse related to the death of another child, gave birth to Child in a toilet causing Columbia County

Children and Youth Services ("CYS") to obtain emergency custody of Child and place Child in foster care, where Child remains.[1]

On August 27, 2015, Father agreed to adjudicate Child dependent and Child remained in placement. The trial court made findings that Father had an indicated report of child abuse against another child[2], CYS suspected that Father used drugs, and Father had a labile affect[3]. The trial court ordered Father to participate in a psychiatric evaluation and follow any treatment recommendations; participate in a drug and alcohol evaluation and follow any treatment recommendations; complete parenting classes, sign releases, and cooperate with CYS.

CYS created Family Service Plan ("FSP") objectives for Father, which remained the same throughout the case, including: (1) address mental health; (2) provide stable housing; (3) maintain bond with Child; (4) meet Child's basic needs; and (5) cease any criminal activity. Father was aware of these FSP objectives, as CYS discussed them with Father on multiple occasions.

_____

[1] Mother voluntarily terminated her parental rights to Child.

[2] Father shot his daughter with a paint gun in the face multiple times, causing bleeding and severe pain.

[3] Labile affect, or pseudobulbar affect, involves frequent, involuntary and uncontrollable outbursts of crying or laughing that are exaggerated or not connected to an individual's emotional state. **_See_** https://psychology.wikia.org/wiki/Labile_affect; https://www.mayoclinic.org/diseases-conditions/pseudobulbar-affect/symptoms-causes/syc-20353737.

On July 22, 2016, after a permanency review hearing, the court made findings that Father was not participating in counseling and was minimally compliant with his FSP objectives. Additionally, the court made a specific finding that Father posted an article on his Facebook page entitled "University Academics Say Pedophilia is 'Natural, and Normal for Males to be AROUSED by Children.'" and Father "now states that he did it by mistake." Order, 7/22/16.

On November 16, 2018, more than three years after Child was adjudicated dependent, CYS filed a Petition to Involuntarily Terminate Father's Parental Rights ("TPR Petition"). On February 15, 2019, CYS filed an Amended TPR Petition and on March 27, 2019, and May 28, 2019, the trial court held hearings. The trial court heard testimony from Jacqueline Saladay, Ph.D., expert in clinical psychology; Kerri Shaylor, CYS caseworker; Laura Hess, CYS caseworker; and Father.

In sum, the trial court heard testimony that Father had made minimal progress toward achieving his FSP goals; Father failed to maintain stable housing, comply with mental health treatment including counseling, maintain stable employment, submit to and pass all requested drug tests, and consistently attend visitation with Child. The trial court also heard testimony that termination of Father's parental rights was in Child's best interest.

Dr. Saladay testified that she evaluated Father on February 5, 2017, diagnosed Father with mixed personality disorder, and recommended Father engage in a year of mental health counseling. N.T. TPR Hearing, 3/27/19, at

11-12. Ms. Shaylor testified that Father informed CYS on multiple occasions that he did not need mental health counseling, failed to provide CYS a list of counselors covered by his insurance, and failed to engage in any counseling. *Id.* at 99-100, 104.

Ms. Shaylor informed the court that in 2018 and 2019, Father refused to submit to six drug screens and on August 10, 2018, he tested positive for methamphetamines. *Id.* at 66-68, 71-73, 76-78.

Ms. Shaylor testified that, despite the court ordering a home evaluation, Father refused to allow CYS to evaluate his home. N.T. TPR Hearing 5/28/19, at 9-10. On March 27, 2019, accompanied by the Sheriff's office, Ms. Shaylor went to Father's last known address and discovered it to be condemned. *Id.* at 9-15. Ms. Shaylor explained that she asked Father for an updated address, and he responded that it was "none of my business." *Id.* at 19.

Ms. Shaylor informed the court that Father missed approximately 23 of the weekly, supervised visitation with Child from 2016 through 2019. N.T. TPR Hearing, 3/27/19, at 128-58.

Finally, Ms. Shaylor testified that Child has special needs and has been diagnosed with a STAG One Gene Mutation, which causes speech and developmental delays; childhood Apraxia, a phonological disorder causing speech delays; and hysperkinesis, which is involuntary stiffening and tightening of his body. *Id.* at 159. Child also has gastroenterological issues, requiring a special diet at times. *Id.* at 160.

Ms. Shaylor explained that Child resides in a pre-adoptive foster home where his physical, social, emotional, and special medical needs are being met; Child has resided in the home since birth. *Id.* at 158-62, 164. Child calls the foster parents "Mommy" and "Daddy" and "acts like siblings" with a younger child in the home. *Id.* at 162. Child receives early intervention services in the home for speech and occupational therapy. *Id.* at 163. Additionally, foster parents take Child to three speech therapy appointments every week and ensure that Child attends all of his medical appointments. *Id.* Ms. Shaylor stated that Father has never attended one of Child's medical or therapy appointments. *Id.* at 161. Ms. Shaylor testified that CYS believes a goal change to adoption and termination of Father's parental rights is Child's best interest. *Id.* at 164-65.

Dr. Saladay testified that Child was "completely bonded" with the foster parents and it was difficult for Child to leave them, even for 20 minutes. *Id.* at 22, 25. Dr. Saladay stated that the foster parents were meeting Child's emotional needs and described "an atmosphere of just complete joy with the way they helped him plan and solve problems and learn things, a very good emotional support and emotional connection." *Id.* at 21.

In turn, Dr. Saladay observed that "[t]here was bonding" between Father and Child "but it wasn't as strong as it was with the foster parents." *Id.* at 24. Dr. Saladay explained that the "bond" between Father and Child "was more like a good babysitter or good friends of the family, uncle, cousin." *Id.* at 24. When asked if she had an opinion about Father's ability to parent

Child, she responded, "[m]y opinion was that I didn't see him as a full-time parent." *Id.* at 24-35. Dr. Saladay recommended that it would be "really good" if the foster parents adopted Child, and proposed an open adoption with a visitation schedule. *Id.* at 25.

Father testified that he did not currently have an address because his home was condemned, and that his landlord was putting him up in a hotel. N.T. TPR Hearing, 5/28/19, at 43-44. Father stated that he previously had suitable housing, lived in multiple addresses at one time, and cooperated with CYS to inform them about the different addresses. *Id.* at 60-63. Father explained that he had weekly supervised visitation with Child and admitted that he missed some scheduled visits because of car problems, sickness, and traveling to Colorado to donate a kidney to a girl who needed a kidney. *Id.* at 46. Father informed the court that he had two jobs and paid child support for Child. *Id.* at 48. Father denied physically abusing his daughter. *Id.* at 59. Father testified that he tried to engage in mental health counseling, and that CYS provided assistance, but that he was unsuccessful finding a local therapist through his insurance. *Id.* at 60, 80-83. Father acknowledged that he had "a couple" of positive drug tests, but explained to the court that, upon retest, the results were negative. *Id.* at 50-51. When counsel asked Father to describe his feelings for Child, he responded, "Well he is my son. I wouldn't still be fighting for him if I didn't care about him." *Id.* at 46.

At the conclusion of the hearings, on July 18, 2019, the trial court entered an Order terminating Father's parental rights and changing Child's permanency goal to adoption.

Father timely appealed. Both Father and the trial court complied with Pa.R.A.P. 1925.

Father raises the following issues for our review:

I.  Whether the [l]ower [c]ourt erred in terminating Father's parental rights because the record does not establish by clear and convincing evidence that Father, for any period of time, evidence a settled purpose of relinquishing his parental rights, or failed to perform his parental duties as required by [23 Pa.C.S. § 2511(a)(1)]?

II. Whether the [l]ower [c]ourt erred in terminating Father's parental rights because the record does not establish by clear and convincing evidence that the conditions that led to the removal or placement of [C]hild were the result of any conduct on behalf of the Father and the record reflects that Father could not have remedied the conditions, that he did not create, within a reasonable period of time as required by [23 Pa.C.S. § 2511(a)(5)?

III. Whether the [l]ower [c]ourt erred in terminating Father's parental rights because the record does not establish by clear and convincing evidence that finding that the termination of Father's parental rights is in the best interests of [C]hild, as required by [23 Pa.C.S. § 2511(a)(8)] and (b)?

Father's Br. at 3.

When we review a trial court's decision to grant or deny a petition to involuntarily terminate parental rights, we must accept the findings of fact and credibility determinations of the trial court if the record supports them. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "If the factual findings are supported,

appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id*. (citation omitted). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted). We may not reverse merely because the record could support a different result. *In re T.S.M.*, 71 A.3d at 267. We give great deference to the trial courts "that often have first-hand observations of the parties spanning multiple hearings." *Id.* Moreover, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, governs termination of parental rights, and requires a bifurcated analysis. "Initially, the focus is on the conduct of the parent." *In re Adoption of A.C.*, 162 A.3d 1123, 1128 (Pa. Super. 2017) (citation omitted). "The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." *Id.* (citation omitted). If the court determines that the parent's conduct warrants termination of his or her parental rights, the court then engages in "the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." *Id.* (citation omitted). Notably, while the trial court here found that CYS met its burden of proof under 23 Pa.C.S. § 2511(a)(1),

(5), (8), and (b), we need only agree with its decision as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm the termination of parental rights. **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Father first avers that the trial court abused its discretion when it terminated his parental rights pursuant to Section 2511(a)(1). Father's Br. at 11. Father argues that there was no evidence to support the contention that Father refused or failed to perform parental duties. **Id.** at 12. Moreover, Father contends, without citation to the record, that even though he never had custody of Child, he was "conscientious with regard to visitation, paid child support, and developed a comfortable, loving relationship with [C]hild." **Id.** Upon review, we find no abuse of discretion.

Section 2511(a)(1) provides that the trial court may terminate parental rights if the Petitioner establishes that "the parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." 23 Pa.C.S. § 2511(a)(1). The focus of involuntary termination proceedings is on the conduct of the parent and whether that conduct justifies a termination of parental rights. **In re B.L.L.**, 787 A.2d 1007, 1013 (Pa. Super. 2001). Although the statute focuses on an analysis of the six months immediately preceding the filing of the petition, "the court must consider the whole history of a given case and not mechanically apply the six-month statutory provision."

- 9 -

*In re K.Z.S.*, 946 A.2d 753, 758 (Pa. Super. 2008) (citation omitted). Rather, "[t]he court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination." *Id.* (citations omitted).

This Court has repeatedly defined "parental duties" in general as the affirmative obligation to provide consistently for the physical and emotional needs of a child:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance. This affirmative duty . . . requires continuing interest in the child and a genuine effort to maintain communication and association with the child. Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citations and internal paragraph breaks omitted).

Moreover, "[p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." *Id.* (citation omitted). "A parent must utilize all

available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." *Id.* (citation omitted). And most importantly, "[p]arental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs." *Id.* (citation omitted).

Our review of the record supports the trial court's determination that CYS met its burden under 23 Pa.C.S. § 2511(a)(1) because Father has failed to perform parental duties for Child's entire life, including the six months preceding the filing of the TPR petition. Father's lack of compliance with his FSP objectives over the past four years has prevented him from moving past weekly-supervised visitation with Child. While Father testified to multiple reasons why he could not achieve his FSP objectives, the trial court made a finding that Father's testimony, as a whole, was not credible. Trial Ct. Op., filed 7/18/19, at 8. Moreover, although Father argues that he conscientiously attended visitation with Child and paid child support, the trial court placed greater weight on Father's noncompliance with drug, alcohol, and mental health counseling. The trial court opined:

> It is found that, in failing to make material progress toward his goals as established by CYS as found above, in continuing his drug use, in failing to establish stable housing, in failing to concretely proceed with his mental health treatment while being able to do so, in failing to establish ongoing, consistent, substantial employment, and in failing to consistently "be there" for Child rather than chronically missing his visitation appointments, Father failed to perform parental duties over the course of Child's entire

- 11 -

> life, including the six (6) months prior to the filing of the original Petition. Father has not significantly provided for Child's emotional needs, and, as was stated on the record, his relationship is as it would be with any friend or periodic acquaintance of Child. Father has not demonstrated a genuine effort to maintain association and communication with Child.
>
> It is found that CYS has proven grounds for involuntary termination of Father's parental rights under [Section] 2511(a)(1)

*Id.* at 12. Our review of the records supports the trial court's findings. We decline to reweigh the evidence or usurp the lower court's credibility determinations. *See In re T.S.M.*, 71 A.3d at 267; *In re M.G.*, 855 A.2d at 73-74. Accordingly, we find no abuse of discretion. Moreover, because we agree with the trial court's decision as to subsection (1) of Section 2511(a), we decline to address subsections (5) and (8) raised in Appellant's remaining issues. *See In re B.L.W.*, 843 A.2d at 384.

Appellant next avers that the trial court erred in in terminating Father's parental rights pursuant to Section 2511(b). Father's Br. at 3. Father argues that CYS failed to present clear and convincing evidence that termination of parental rights would be in Child's best interest. *Id.* at 15. Father contends that despite the limited contact between Father and Child, the record establishes that Father and Child have a bond and severing that bond would be detrimental to Child. *Id.* at 16. We disagree.

With respect to Section 2511(b), our analysis shifts focus from parental actions in fulfilling parental duties to the effect that terminating the parental bond will have on the child. Section 2511(b) "focuses on whether termination of parental rights would best serve the developmental, physical, and

emotional needs and welfare of the child." **In re Adoption of J.M.**, 991 A.2d 321, 324 (Pa. Super. 2010). It is well settled that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). This Court has emphasized that although a parent's emotional bond with his or her child is a "major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the trial court when determining what is in the best interest of the child." **In re A.D.**, 93 A.3d 888, 897 (Pa. Super. 2014) (citation omitted). Finally, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." **In re K.Z.S.**, 946 A.2d at 762–63.

Father argues that severing the existing bond between himself and Child would be detrimental to Child, but the record belies that claim. The trial court heard testimony that the bond between Father and Child was not a parent-child bond, but rather the kind of bond between "a good babysitter or good friends of the family, uncle, cousin." N.T. TPR Hearing, 3/27/19, at 24. Dr. Saladay testified that Child does not like to leave the foster parents for even 20 minutes, but the record is devoid of evidence indicating that Child experiences distress when he leaves Father. **Id.** at 22, 25. Also, the trial court heard testimony that Child experiences "complete joy" in his current

foster home, the only home he has ever known, and that the foster parents meet his physical, social, emotional, and special medical needs on a daily basis. *Id.* at 32, 158-62, 164. The trial court made findings that Child has never lived with Father, Father has failed to comply with his FSP objectives to progress past weekly-supervised visitation and step into the role of a parent, and that termination of parental rights was in Child's best interest. The trial court opined:

> Child has been in placement since birth, a period of more than four (4) years at this writing. He has developed a great relationship with [f]oster [p]arents and they have bonded. Father has never quite stepped up to the duties of being a father[.] At best he has superficially and sporadically gone through the motions. Foster [p]arents are willing to give Child a life, and are waiting in the wings to become adoptive parents. Terminating Father's parental rights, and paving the way for adoption are in Child's best interest, needs, and welfare.
>
> * * *
>
> Father's unstable housing and employment are within his control, but he is so oppositional and argumentative that he will not settle into one home or job. If Father would have sustained and persevered in his efforts in employment and housing, in abstaining from his drug use, and in religiously placing a first priority on attending visitation with Child, a different result may have occurred. Nonetheless, this all was within Father's control, and he has failed.
>
> As such, it is found that [CYS] has proved the elements required by [Section 2511(b)] by clear and convincing evidence.

Trial Ct. Op., filed 7/18/19, at 16-17. The record supports the trial court's findings and, thus, we find no abuse of discretion.

In conclusion, the trial court did not abuse its discretion when it found that CYS presented clear and convincing evidence to terminated Father's parental rights and change Child's permanency goal to adoption.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 04/08/2020